[11 NYS3d 256]

In the Matter of JAMES R. LANGIONE, an Attorney, Respondent. GRIEVANCE COMMITTEE FOR THE NINTH JUDICIAL DISTRICT, Petitioner.

Second Department, June 24, 2015

**APPEARANCES OF COUNSEL**

*Gary L. Casella*, White Plains (*Antonia Cipollone* and *Matthew Lee-Renert* of counsel), for petitioner.

*Langione Catterson & LoFrumento, LLP*, Garden City (*Jeffrey L. Catterson* of counsel) for respondent.

**OPINION OF THE COURT**

Per Curiam.

Background

This matter is the corollary to an earlier disciplinary proceeding commenced against the respondent's former law partner, Peter Galasso, which resulted in a decision by this Court suspending Peter Galasso from the practice of law for a period of two years for, inter alia, violating his fiduciary obligations (*see Matter of Galasso*, 105 AD3d 103 [2013], *on remittitur from Ct App* 19 NY3d 688 [2012], *modfg in part, affg in part* 94 AD3d 30 [2012]).

The charges against the respondent arise from his conduct, as a law partner of Peter Galasso, relative to the maintenance of fiduciary funds held by their firm (hereinafter the firm), incident to the practice of law. As in the case against Peter

Galasso, the charges against the respondent center around the undisputed misappropriation of more than $5 million from the firm's multiple escrow accounts. The respondent, like Peter Galasso, did not directly engage in the misappropriation of client funds. Rather, fiduciary funds held by the firm were misappropriated by Peter Galasso's brother, Anthony Galasso, the firm's bookkeeper and office manager.

The fraudulent and deceptive conduct engaged in by Anthony Galasso is summarized in the following excerpts from the Court of Appeals decision in *Matter of Galasso* (19 NY3d 688, 692-693 [2012]):

> "Anthony Galasso, in his capacity as office manager, deposited the funds into an escrow account at Signature Bank (the Baron escrow account). [Peter Galasso] and fellow partner James Langione were the only authorized [signatories] on the account application. However, Anthony Galasso apparently altered the application to permit electronic fund transfers and to include himself—a nonlawyer—as a [signatory].

> "Between June 23, 2004 and January 17, 2007, Anthony Galasso transferred approximately $4,501,571 from the Baron escrow account into six other firm accounts maintained at Signature Bank through the use of roughly 90 Internet transfers. It seems that the Baron funds were used to replace money that Anthony Galasso had already removed from [other] firm accounts. Transferred funds from the Baron escrow account were then disbursed to [Peter Galasso], firm employees and other entities in the course of business, all without the knowledge of the firm's principals or the consent of the Barons. In particular, approximately $360,000 in funds transferred from the Baron escrow account were used to finance the purchase of the firm's office condominium. To escape detection, Anthony Galasso had the genuine Baron escrow account statements, generated by the bank, diverted to a post office box and fabricated false statements for review by the firm. . . .

> "Anthony Galasso confessed to the theft of the above funds on January 18, 2007 and ultimately

pleaded guilty to two counts of grand larceny in the first degree, 10 counts of falsifying business records in the first degree and 10 counts of criminal possession of a forged instrument in the second degree. He was sentenced to 2½ to 7½ years' imprisonment, as well as $2,000,000 in restitution."

As in the case of Peter Galasso, the respondent's culpability is predicated upon his failure to properly oversee the management of the firm's bank accounts, including necessary supervision of the firm's employee, Anthony Galasso.

The Grievance Committee served the respondent with a petition dated December 21, 2012, containing 12 charges of professional misconduct. Following a prehearing conference on June 13, 2013 and a hearing on October 17, 2013, the Special Referee sustained all 12 charges. The Grievance Committee now moves to confirm the report of the Special Referee, and to impose such discipline upon the respondent as this Court deems appropriate. The respondent cross-moves to disaffirm the report of the Special Referee in its entirety but submits that, in the event the charges are sustained, the appropriate sanction is a public censure. We find that the Special Referee properly sustained charges 1 through 5 and 7 through 12. However, we find that the Special Referee improperly sustained charge 6, insofar as it is duplicative of charges 2, 3, and 4, collectively. Furthermore, we find, based upon the evidence adduced, that charge 9 was sustained only to the extent that the respondent violated former Code of Professional Responsibility DR 1-102 (a) (7) (22 NYCRR 1200.3 [a] [7]).

Charge 1 of the verified petition alleges that the respondent was a signatory for an interest-bearing escrow account maintained at Signature Bank, account No. xxxxxx1064, which was entitled "Stephen Baron Galasso Langione LLP Escrow Agents" (hereafter the Baron escrow account). On or about June 11, 2004, funds totaling $4,840,862.34 were deposited into the Baron escrow account. From June 11, 2004 through mid-January 2007, there were a series of web transfers of Baron funds totaling more than $4.3 million from the Baron escrow account into various accounts maintained by the respondent and/or the firm with Signature Bank (hereinafter the firm's Signature accounts). Following those transfers from the Baron escrow account into the firm's Signature accounts, the Baron funds were disbursed to the respondent, other members and employees of the firm, various third persons, and various

business entities. Stephen and Wendy Baron, the parties ultimately entitled to receive the Baron funds, did not consent to, nor benefit from, the above-referenced disbursement of their funds. Stephen Baron and/or Wendy Baron, to date, have not received the $4.3 million disbursed from the Baron escrow account, which was to have been held in a fiduciary capacity. The respondent failed to take reasonable steps to ensure that the funds maintained in the Baron escrow account were safeguarded. By reason of the foregoing, the respondent violated former Code of Professional Responsibility DR 9-102 (a) and/or DR 1-102 (a) (7) (22 NYCRR 1200.46 [a]; 1200.3 [a] [7]).

Charge 2 alleges that the respondent was a signatory of certain interest on lawyer accounts (hereinafter IOLA accounts) maintained at Signature Bank (account No. xxxxxx639) and/or M&T Bank (account No. xxxxxx9485) (hereinafter Signature Bank IOLA account and M&T Bank IOLA account, respectively), which were attorney escrow accounts used by the firm incident to its practice of law. In or about December 2005 or January 2006, the firm settled a medical malpractice/wrongful death lawsuit on behalf of the estate of George Carroll (hereinafter the Carroll estate) for the sum of $800,000. On or about June 7, 2006, the settlement proceeds of $800,000, which were received by the firm on behalf of the Carroll estate, were deposited into the M&T Bank IOLA account. The respondent failed to take reasonable steps to ensure that the funds entrusted to the firm remained safely on deposit in the M&T Bank IOLA account until such time as the firm was authorized to disburse the funds to the legal representatives of the Carroll estate. In or about January 2007, the firm gave written notice to the legal representatives of the Carroll estate that funds had been misappropriated from the M&T Bank IOLA account, in which the funds due to the Carroll estate had been deposited. In or about January 2008, the firm disbursed the sum of $85,791.36 to the Carroll estate. Upon information and belief, the Carroll estate has not received the balance of the funds due to it, which had been received by the respondent in a fiduciary capacity. By reason of the foregoing, the respondent violated former Code of Professional Responsibility DR 9-102 (a) and/or DR 1-102 (a) (7) (22 NYCRR 1200.46 [a]; 1200.3 [a] [7]).

Charge 3 alleges that, on or about August 9, 2006, $50,000 was deposited into the M&T Bank IOLA account on behalf of Adele Fabrizio in connection with the settlement of a personal

injury lawsuit in which the firm represented her. On or about August 25, 2006, an additional $125,000 was deposited into the M&T Bank IOLA account on behalf of Fabrizio, in connection with the settlement of her personal injury action. The respondent failed to take reasonable steps to ensure that the funds entrusted to the firm for Fabrizio remained safely on deposit in the M&T Bank IOLA account, until such time as the firm was authorized to disburse the funds to Fabrizio. In or about January 2007, the firm gave written notice to Fabrizio that funds had been misappropriated from the M&T Bank IOLA account. In or about January 2008, the firm disbursed the sum of $25,000 to Fabrizio. Upon information and belief, to date, Fabrizio has not received the balance of the funds due and owing to her. By reason of the foregoing, the respondent violated former Code of Professional Responsibility DR 9-102 (a) and/or DR 1-102 (a) (7) (22 NYCRR 1200.46 [a]; 1200.3 [a] [7]).

Charge 4 alleges that in or about April 2006, a settlement was reached in the personal injury action brought by the firm on behalf of Theresa Halloran. Thereafter, the respondent and the firm received, in a fiduciary capacity, settlement proceeds on behalf of Halloran totaling at least $157,090.15. The respondent failed to take reasonable steps to ensure that the funds entrusted to the firm remained safely on deposit in an IOLA account, until such time as the firm was authorized to disburse the funds to Halloran. In 2007, the firm notified Halloran that funds had been misappropriated from the account(s) in which the funds due to her had been deposited. In or about January 2008, the firm disbursed the sum of $35,000 to Halloran. Neither Halloran (now deceased) nor her estate, to date, has received the balance of the funds due and owing. By reason of the foregoing, the respondent violated former Code of Professional Responsibility DR 9-102 (a) and/or DR 1-102 (a) (7) (22 NYCRR 1200.46 [a]; 1200.3 [a] [7]).

Charge 5 alleges that in the exercise of reasonable management and supervisory authority, the respondent would have been aware of the inappropriate handling of the Baron escrow account, and/or the firm's IOLA account(s), and the unlawful and improper disbursements of funds received on behalf of the Barons, the Carroll estate, Fabrizio, and Halloran, so that remedial action could have been taken to avoid or mitigate the losses to those respective clients. By reason of the foregoing, the respondent violated former Code of Professional Responsibility DR 1-104 (d) (2) (22 NYCRR 1200.5 [d] [2]).

Charge 7 alleges that on or about March 1, 2004, $100,000 was deposited into the Signature Bank IOLA account on behalf

of Sandra Crawford. By March 17, 2004, $52,220.29 of the $100,000 had been disbursed to the firm, leaving a balance of $47,779.71. The balance of the Signature Bank IOLA account fell below the amount that should have been on deposit for the Crawford matter on March 19, 2004, and remained below that amount until April 22, 2004, reaching a low of $2,695.88 on April 8, 2004. On or about July 7, 2004, $20,000 was deposited into the Signature Bank IOLA account on behalf of Danielle Aloisio. During the period from July 20, 2004 through July 25, 2004, the balance fell to $11,061, and on August 2 and 3, 2004, the account balance fell to $2,518.62. This was below the amount due to Aloisio, $12,118.45, which was paid to her on August 31, 2004. The respondent failed to take reasonable steps to ensure that the client funds on deposit in the Signature Bank IOLA account with respect to the Crawford and Aloisio matters remained fully intact. By reason of the foregoing, the respondent violated former Code of Professional Responsibility DR 9-102 (a) and/or DR 1-102 (a) (7) (22 NYCRR 1200.46 [a]; 1200.3 [a] [7]).

Charge 8 alleges that during the period from January 1, 2004 through December 31, 2005, in one or more of the following matters (matter names refer to the client/party), funds from the Signature Bank IOLA account were disbursed by checks totaling an amount that was greater than the amounts on deposit, as follows:

| Matter | Approximate Excess Disbursement |
| --- | --- |
| Aloisio | $ 21,454.42 |
| Brazil | $ 267,174.69 |
| Brown | $ 8,374.25 |
| Daigh | $ 10,366.61 |
| Freire | $ 25,436.77 |
| Kakareko | $ 7,428.80 |
| Kildale | $ 2,772.00 |
| Levene | $ 1,339.00 |
| LoFrumento/Avens | $ 8,499.33 |
| Lynch | $ 5,078.07 |
| Martin | $ 46,850.78 |
| Onorato | $ 14,047.53 |
| Pizzini | $ 372.68 |
| Suijovic | $ 40,548.29 |
| Vanlingen | $ 10,500.00 |
| Weber | $ 22,588.44 |
| Wozniak | $ 481.00 |

The respondent failed to take reasonable steps to ensure that the funds entrusted to the firm in one or more of the foregoing matters were disbursed appropriately from the Signature Bank

IOLA account, in order to ensure that client funds were not misappropriated. By reason of the foregoing, the respondent violated former Code of Professional Responsibility DR 9-102 (a) and/or DR 1-102 (a) (7) (22 NYCRR 1200.46 [a]; 1200.3 [a] [7]).

Charge 9 alleges that during the period from January 1, 2006 through December 31, 2006, the respondent intended for funds that he and the firm received on behalf of clients and/or other third parties to be deposited into the M&T Bank IOLA account. During that period, it was the respondent's understanding that the Signature Bank IOLA account had been closed and/or was no longer being used by the firm. During that period, funds received by the firm in a fiduciary capacity were deposited into the Signature Bank IOLA account:

| Matter | Approximate Deposit Amount |
| --- | --- |
| Ferrara | $ 20,000 |
| Gant | $ 5,000 |
| Garber | $ 12,500 |
| Halloran | $ 27,000 |
| Kakareko | $ 45,000 |
| Reid | $ 67,500 |
| Rivera | $ 15,000 |

The respondent failed to take reasonable steps to ensure that the funds entrusted to the firm in one or more of the foregoing matters were properly deposited into the M&T Bank IOLA account, as intended. By reason of the foregoing, the respondent violated former Code of Professional Responsibility DR 1-102 (a) (7) (22 NYCRR 1200.3 [a] [7]).

Charge 10 alleges that during the period from January 1, 2004 through December 31, 2005, the following "web transfers" were made from the Signature Bank IOLA account:

| Date | Amount of Disbursement by Web Transfer |
| --- | --- |
| 1/13/04 | $ 10,685.00 |
| 1/22/04 | $ 8,000.00 |
| 3/17/05 | $100,000.00 |
| 3/31/05 | $ 30,392.19 |
| 6/16/05 | $192,049.00 |

The respondent did not take reasonable steps to ensure that all disbursements from the account were made to a named payee and/or a record of the purpose of one or more of the foregoing disbursements was maintained. By reason of the foregoing, the respondent violated former Code of Professional Responsibility DR 9-102 (e) and/or (d) (1) (22 NYCRR 1200.46 [e], [d] [1]).

Charge 11 alleges that during the period from January 1, 2004 through December 31, 2005, the following deposits were made by "web transfers" into the Signature Bank IOLA account:

| Date | Amount of Deposit by Web Transfer |
|------|-----------------------------------|
| 6/23/04 | $ 25,000.00 |
| 6/24/04 | $ 50,000.00 |
| 8/04/04 | $ 50,000.00 |
| 4/27/05 | $100,000.00 |
| 5/04/05 | $ 25,000.00 |
| 6/24/05 | $ 50,000.00 |
| 9/28/05 | $125,000.00 |
| 10/03/05 | $100,000.00 |
| 10/25/05 | $ 62,321.04 |
| 12/28/05 | $ 10,000.00 |

The respondent failed to take reasonable steps to ensure that a record reflecting the source and description of one or more those deposits was maintained. By reason of the foregoing, the respondent violated former Code of Professional Responsibility DR 9-102 (d) (1) (22 NYCRR 1200.46 [d] [1]).

Charge 12 alleges that in one or more of the following matters, funds were not deposited appropriately into the Signature Bank IOLA account, from which disbursements were made:

| Matter | Amount of Funds Disbursed |
|--------|---------------------------|
| Albanese | $ 12,998.50 |
| Armacida | $ 29,638.34 |
| Castro | $ 16,250.00 |
| Froberg | $ 2,000.00 |
| Galley | $ 10,352.70 |
| Jennings | $ 8,018.21 |
| Jiminez | $ 20,622.54 |
| Lenane | $ 27,737.88 |
| Lexington | $ 400.00 |
| Lofrumento | $ 4,764.27 |
| McLaughlin | $ 31,635.93 |
| Menillo | $ 81,432.46 |
| Paladino | $ 11,550.05 |
| Palmerini | $ 3,170.00 |
| Pugliese | $ 31,133.01 |
| Radoff | $ 17,000.00 |
| Rippili & O'Connell | $ 25,977.92 |
| Rosenberg | $ 23,457.89 |
| Shallo | $ 2,100.00 |
| Siarezi | $ 19,578.14 |
| Williams | $ 6,166.25 |

The respondent failed to take reasonable steps to ensure, in one or more of these matters, that the disbursements made from the Signature Bank IOLA account corresponded ap-

propriately to funds that previously had been deposited therein. By reason of the foregoing, the respondent violated former Code of Professional Responsibility DR 9-102 (a) and/or DR 1-102 (a) (7) (22 NYCRR 1200.46 [a]; 1200.3 [a] [7]).

With respect to charge 1, the respondent contends that his only involvement in the Baron matter was limited to his being a signatory on the escrow account; he was not a signatory to the escrow agreement. The respondent testified that in becoming a signatory on the escrow account, he merely was "[fulfilling] a bank requirement," and that he had no fiduciary obligation with respect thereto. The Special Referee found that the record is, indeed, "bereft of any oversight . . . exercised by [the respondent] with respect to that account." However, the respondent's testimony that, to his "great reluctance," he became a signatory demonstrated "his understanding of the significance of being a fiduciary on a five million dollar escrow account." In sustaining the charge, we note, as stated by the Court of Appeals, that "[f]ew, if any, of an attorney's professional obligations are as crystal clear as the duty to safeguard client funds" (*Matter of Galasso*, 19 NY3d at 694). Additionally, an attorney's obligation to safeguard funds is not controlled "solely by the contractual language of the escrow agreement, but also by a fiduciary relationship" (*id*.). The "implementation of any of the basic measures" that were subsequently adopted by the firm— "personal review of the bank statements, personal contact with the bank and improved oversight of the firm's books and records"—likely would have mitigated, if not avoided, the losses (*id*.).

With respect to charges 2, 3, and 4, the Special Referee found, and we agree, that the respondent's "failure to provide appropriate oversight [over] his IOLA account(s) led to his clients' losses." The respondent admittedly did not review actual account records (i.e. bank statements or cancelled checks), or even purported account records which were fabricated by Anthony Galasso. Rather, he relied upon "inadequate monthly reports" prepared by Anthony Galasso, which did not include any such records. Moreover, while the respondent testified that he "routinely" verified with the bank that deposits had been made and cleared, he failed to maintain vigilance over the account balances. We note, as did the Special Referee, that doing so would have revealed that the balance of funds in the Carroll estate matter was less than what it should have been, a mere two months after $800,000 was deposited. Likewise, the re-

spondent would have discerned that the balance was "facially insufficient" with respect to the Fabrizio and Halloran matters. The Special Referee correctly questioned the respondent's assertion that he "routinely communicated with the bank," inasmuch as he failed to become aware that the firm's Signature Bank IOLA account had remained open, and that deposits continued to be made therein, when it was his "understanding" that the account had been closed. We agree with the Special Referee's conclusion that the respondent's "lack of meaningful oversight of the IOLA account resulted in a failure to safeguard [clients'] funds, and created the climate for [the] misappropriation" of funds by Anthony Galasso.

With respect to charge 5, the Special Referee found that the record demonstrates reliance by the respondent on Anthony Galasso's "inadequate monthly reports," rather than reviewing actual account records (or even purported account records which were fabricated by Anthony Galasso). Further, the Special Referee noted the respondent's reliance on the firm's accountant, Daniel Samela, to review account records without significant oversight. In the Special Referee's words, which we adopt, there was a "lack of meaningful oversight of the tasks delegated to Anthony Galasso and Daniel Samela." The Special Referee concluded, and we agree, that if the respondent had "exercised reasonable management authority in verifying the information provided to him, the improper activity in the [firm's] accounts would have been discovered and the losses mitigated." As the Court of Appeals emphasized in *Matter of Galasso (supra)*, it is the ethical responsibility of the attorney to safeguard fiduciary funds—not that of the bookkeeper, the office manager, or the accountant, to whom such tasks may be delegated (*see Matter of Galasso*, 19 NY3d at 695).

With respect to charge 7, the record evidences that on or about March 1, 2004, $100,000 was deposited into the Signature Bank IOLA account on behalf of Sandra Crawford, and that the balance fell below and remained below the amount that should have been on deposit for the Crawford matter until April 22, 2004, reaching a low of $2,695.88 on April 8, 2004. Similarly, on July 7, 2004, $20,000 was deposited into the Signature Bank IOLA account on behalf of Danielle Aloisio, and, on August 2 and 3, 2004, the account balance fell to $2,518.62. This was below the amount due to her of $12,118.45, which was not paid to her until August 31, 2004. The respondent was aware that both deposits (i.e. Crawford and Aloisio)

were made by insurance company checks. The Special Referee concluded, and we agree, that if the respondent had exercised reasonable oversight and checked the balances, those deficiencies would have become apparent. As stated by the Court of Appeals, a discrepancy in an escrow account "should, at a minimum, be alarming to a reasonably prudent attorney" (*Matter of Galasso*, 19 NY3d at 695). We agree with the Special Referee that the facts of charge 7 demonstrated warning signs that would have been apparent had more care been exercised in managing the escrow accounts and supervising the firm's bookkeeper.

With respect to charge 8, the record contains multiple instances where funds in the Signature Bank IOLA account were disbursed in a manner inconsistent with the purpose for which they were deposited and/or the amount of corresponding deposits. Indeed, the aggregate disbursements for 17 client matters exceeded the amount of deposits with respect to those matters. Although the respondent admitted that excess funds had been disbursed, he attributed this to unauthorized transactions made by Anthony Galasso. However, of the 17 matters at issue, 10 were tort cases within the respondent's acknowledged purview. Moreover, most of the disbursements were payable to the firm, for expenses. In the absence of any formal review and/or reconciliation of the Signature Bank IOLA account—i.e. matching cancelled checks with the appropriate client matter—there was no opportunity to discover any discrepancies and, more specifically, any improper activity by Anthony Galasso. With respect to the seven non-tort cases, the Special Referee noted that most of the checks appear to bear the respondent's signature. We agree with the Special Referee that the existence of a direct reconciliation system would have revealed the forged signatures. Once again, the Special Referee found, and we agree, that the facts demonstrated warning signs that would have been apparent had more care been exercised in managing the escrow accounts and supervising the bookkeeper (*see Matter of Galasso*, 19 NY3d at 695).

With respect to charge 9, the respondent acknowledged that, during the period in question, it was his understanding that the Signature Bank IOLA account had been closed and was no longer being used by the firm. However, funds received by the firm in a fiduciary capacity continued to be deposited into that account—without the knowledge of the respondent or the firm—by Anthony Galasso. The record reflects that the subject

funds were related to personal injury matters, which were within the respondent's purview. The Special Referee concluded, and we agree, that the funds were able to be improperly deposited into an account that was purportedly closed as a result of the respondent's failure to supervise the deposits, a task which had been delegated to Anthony Galasso. Although the respondent contended that it was his practice to personally contact the bank to ensure that deposits had been made and cleared, it is apparent that the respondent could not have contacted M&T Bank, where the funds should have been deposited, as he claimed to have done.

With respect to charges 10 and 11, the respondent attributed the subject deposits and disbursements to "web transfers" that were never authorized by the respondent or the firm. However, neither the respondent, nor the firm, had a practice of reviewing Anthony Galasso's records to ensure they were properly maintained. Monthly reports prepared by Anthony Galasso did not fully document deposit and disbursement information (as required by the former Code of Professional Responsibility), including web transfers, which are inconsistent with the strictures of the former Code of Professional Responsibility. The Special Referee concluded, and we agree, that if the respondent had reviewed the actual bank records for the periods when the transactions occurred, or engaged in a direct review of the purported reconciliations by the firm's accountant, Daniel Samela, the improper web activity could have been discovered.

With respect to charge 12, the respondent initially denied that disbursements were made in the absence of corresponding deposits, thereby creating the risk that funds on deposit for other clients would or could be compromised. However, the Special Referee noted that the bank records in evidence demonstrated that, in several instances, funds were disbursed from the Signature Bank IOLA account for matters in which there had been no corresponding deposit. Ultimately, the respondent himself acknowledged an inability to locate deposits corresponding to the subject disbursements.

Based upon the respondent's admissions and the evidence adduced, we find that the Special Referee properly sustained charges 1 through 5, 7, 8, 9 (to the extent that the respondent violated former Code of Professional Responsibility DR 1-102 [a] [7] [22 NYCRR 1200.3 (a) (7)]) and 10 through 12, and those charges are sustained. Accordingly, the petitioner's motion to

confirm the Special Referee's report is granted in part, and denied in part, as described above. Similarly, the respondent's cross motion to disaffirm the Special Referee's report is granted in part, and denied in part, as described above, and his request that any discipline imposed be limited to a public censure is denied.

In determining an appropriate measure of discipline to impose, this Court is guided by the precedent set by *Matter of Galasso* (19 NY3d at 694), and this Court's decision on remittitur in that matter (105 AD3d 103 [2013]). Several factors enumerated by the Court of Appeals are applicable.

As previously stated, "[f]ew, if any, of an attorney's professional obligations are as crystal clear as the duty to safeguard client funds" (*Matter of Galasso*, 19 NY3d at 694). The respondent, like his partner, Peter Galasso, failed to exercise appropriate oversight of the firm's accounts and records and/or the firm's bookkeeper.

Additionally, the Court of Appeals held that an attorney's obligation to safeguard funds is not controlled "solely by the contractual language of the escrow agreement, but also by a fiduciary relationship" (*id.*). With respect to the Baron funds, we recognize that the respondent—a signatory to the account, with an attendant fiduciary obligation—was not Baron's attorney, or the designated escrow agent. To the extent that this particular escrow account was maintained in an independent, interest-bearing escrow account, due to its size and the anticipated duration of the escrow obligation, the respondent had a lesser responsibility toward the funds than his partner, Peter Galasso, who was the attorney, as well as the designated escrow agent.

However, with respect to the invasion of other escrow funds, which belonged to the respondent's clients (e.g. the Carroll estate, Adele Fabrizio, and Theresa Halloran), the respondent's level of responsibility was greater. Had the respondent properly fulfilled his fiduciary obligations with respect thereto, red flags would have alerted him to irregularities at a time when ongoing thefts by Anthony Galasso could have been prevented or ameliorated.

Unlike the respondent's partner, Peter Galasso, the respondent received no "unjust enrichment" from the defalcations by Anthony Galasso. Indeed, the respondent injected personal funds into the firm's purchase of an office condominium, rather than funds derived from the fraudulent activities of Anthony Galasso, as Peter Galasso did.

Moreover, the respondent attempted to make restitution to his aggrieved clients—the Carroll estate, Adele Fabrizio, and Theresa Halloran—from his personal funds, independent of, and in addition to, settlement funds obtained and disbursed as a result of litigation.

Under the totality of the circumstances, the respondent is suspended from the practice of law for a period of six months.

ENG, P.J., MASTRO, RIVERA, DICKERSON and CHAMBERS, JJ., concur.

Ordered that the petitioner's motion to confirm the Special Referee's report is granted in part and denied in part; and it is further,

Ordered that the respondent's cross motion to disaffirm the Special Referee's report is granted in part and denied in part; and it is further,

Ordered that the respondent, James R. Langione, is suspended from the practice of law for a period of six months commencing July 24, 2015, and continuing until further order of this Court with leave to apply for reinstatement upon the expiration of that period, upon furnishing satisfactory proof that during that period he: (1) refrained from practicing or attempting to practice law, (2) fully complied with this order and with the terms and provisions of the written rules governing the conduct of disbarred, suspended, and resigned attorneys (*see* 22 NYCRR 691.10), (3) complied with the applicable provisions of 22 NYCRR 691.11 (c) (4), (4) remained current in his attorney registration pursuant to Judiciary Law § 468-a and Rules of the Chief Administrator of the Courts (22 NYCRR) § 118.1 (c), and (5) otherwise properly conducted himself; and it is further,

Ordered that pursuant to Judiciary Law § 90, during the period of suspension and until the further order of this Court, the respondent, James R. Langione, shall desist and refrain from (1) practicing law in any form, either as principal or agent, clerk, or employee of another, (2) appearing as an attorney or counselor-at-law before any court, judge, justice, board, commission, or other public authority, (3) giving to another an opinion as to the law or its application or any advice in relation thereto, and (4) holding himself out in any way as an attorney and counselor-at-law; and it is further,

Ordered that if the respondent, James R. Langione, has been issued a secure pass by the Office of Court Administration, it

shall be returned forthwith to the issuing agency and the respondent shall certify to the same in his affidavit of compliance pursuant to 22 NYCRR 691.10 (f).